928 So.2d 45 (2005)
Leroy McKNIGHT
v.
Admone McCASTLE.
No. 2004 CA 2437.
Court of Appeal of Louisiana, First Circuit.
December 22, 2005.
Writ Denied April 24, 2006.
*47 Craig S. Watson, Baton Rouge, for PlaintiffAppellee Leroy McKnight.
Mark D. Plaisance, Baker, for DefendantAppellant Admone McCastle.
Before: WHIPPLE, McCLENDON, and WELCH, JJ.
WELCH, J.
This is an appeal by the defendant/lessor, Admone McCastle, from a judgment rendered following a trial, finding the defendant 75% at fault and liable to the plaintiff/lessee, Leroy McKnight, for damages sustained by Mr. McKnight when he fell through "steps" located outside the front door of the house that he was renting from the defendant. The plaintiff was found to be 25% at fault and has not appealed that finding. Finding no merit to the defendant's appeal regarding liability or general damages, we affirm that portion of the judgment. However, for reasons that follow herein, the award for lost wages is amended to correct an erroneous calculation.

FACTS
The evidence presented at trial established that the plaintiff and his wife rented the house from the defendant in December of 1998. On July 3, 1999, Mr. McKnight was leaving to go to an aunt's funeral when the "make-shift" concrete blocks and plywood which constituted the front steps to the house suddenly "caved in" under his foot, causing him to fall and slide down on his back. According to the plaintiff and his wife, Mr. McKnight immediately felt "excruciating pain" going down his back and his left leg and he knew that he had injured his back, but insisted, "I'm still going to my auntie's funeral though." According to the medical evidence presented, he sustained injuries including "lumbar radiculopathy secondary to a disc herniation" at the L5-S1 level with nerve root impingement on the left S1 nerve root.
Both Mr. and Mrs. McKnight testified that they complained "numerous" times to Mr. McCastle about the deplorable and dangerous condition of the steps leading to the front door and that Mr. McCastle always responded to them that he would take care of it, but he never did. Mr. McCastle testified that he purchased the house in 1996 or 1997 and had rented it out since that time. He admitted to being the person responsible for the "overall general upkeep" of the house. However, according to Mr. McCastle, the house, including the steps, was in "good condition" other than a "slight leak in the sink that had caused the cabinet to kind of rot out a little bit." Mr. McCastle denied ever receiving any complaints from the plaintiff or his wife regarding the steps and claimed that he first learned about plaintiff's fall and alleged injuries when this suit was filed. The defendant also presented the testimony of his son, Peron McCastle, who visited the rental house about once a year to pick pecans and testified that there was nothing wrong with the house and although it was an old house, it was in "living condition."
The most significant evidence contained in the record consists of several photographs of the "steps" on which the plaintiff fell that were taken by the plaintiff after the accident. We place "steps" in quotations because to classify what is shown in the photographs as steps stretches quite far the definition of what is more commonly recognized as steps. Because these photographs are truly worth a thousand *48 words, we can only best summarize what is depicted therein as a hollowed-out hole surrounded by broken-up concrete, which apparently, at some point in time in the past, served as the framework for steps. However, instead of steps, over the gaping hole, is a thin, obviously rotted and broken piece of plywood. Over this piece of plywood is a slightly more substantial looking piece of plywood that the plaintiffs testified they placed over the rotted piece that caved in during the accident. The photographs also reveal cinder blocks that the plaintiff's wife placed underneath the plywood inside of the hole after the accident to provide some support for the new piece of plywood.
Based on the foregoing evidence, the trial court ruled "that defendant owner knew or should have known of the defect and had requisite notice and failed to remedy the defect within a reasonable time." In written reasons for judgment, the trial court made an express credibility determination finding that the plaintiff notified the defendant of the existing defects in the premises and still the defendant failed to remedy the danger. The trial court assigned 75% fault to the defendant and 25% fault to the plaintiff, whom the court found also knew of the substandard nature of the property in question, although unaware that it would cave in. The defendant appeals, raising five assignments of error.

LIABILITY
In his first assignment of error, the defendant claims the trial court erred in finding that a defect existed on the premises based only on "the testimony of the partiesand the introduction of a few photographs." While defendant acknowledged plaintiff's testimony that the steps "were not much more than crumbled concrete and bricks upon which a quarter inch piece of plywood sat atop," he argues that this condition did not prevent their daily use by the McKnights, who used the steps without incident preceding the accident; therefore, it was error to conclude they constituted a defect.
In his second assignment of error, the defendant argues the trial court erred in finding a defect existed absent any expert testimony regarding the dangerousness of the steps or any evidence regarding the age of the house and its conformity with building codes or other regulations.
Defendant's arguments wholly discredit the evidence presented by the plaintiff, consisting of his and Mrs. McKnight's testimony, which the trial court obviously found credible, and the very telling photographs. Defendant also ignores that, as a matter of law, this evidence is sufficient to establish by a preponderance of the evidence the existence of a defect, notwithstanding the lack of expert testimony. When a defect is open and obvious, such as the dilapidated hole serving as the front entrance to the house leased by the plaintiff, expert testimony is unnecessary, and common sense can, should and did prevail.
In his third assignment of error, the defendant claims that the plaintiff as tenant agreed to assume responsibility for his own liability and to maintain the leased property in a safe and secure manner; therefore, the trial court erred in holding him liable. This assignment has no merit for several reasons. First, defendant admitted at trial that as the lessor, he considered himself as being the person responsible for the "overall general upkeep" of the house. This is correct as a matter of law. Louisiana Civil Code article 2696 provides that the lessor warrants that the property leased is free of vices or defects that prevent its use for that purpose. This legal warranty even extends to vices or defects that arise after the delivery of the thing and are not attributable to the fault of the *49 lessee. La. C.C. art. 2696. In this case, there was a sufficient factual basis for the trial court's credibility determination and conclusion that the deplorable condition of the steps existed from the inception of the rental of the property by the plaintiff and that he complained to the defendant about the dangerous condition and requested that it be it repaired. Therefore, we may not disturb that finding.
Although the above-mentioned statutory warranty against vices and defects may be dispensed with as a condition of a lease and are not against Louisiana public policy, to be effective, such waiver must be written in clear and unambiguous terms, contained in a written contract, and brought to the attention of the lessee or explained to him. Walnut Equipment Leasing Co., Inc. v. Moreno, 26,004 (La. App. 2nd Cir.9/21/94), 643 So.2d 327, 332. The evidence presented by the defendant in support of his claim that the plaintiff assumed responsibility for his own liability falls short on all accounts. The defendant introduced a document entitled "Rental Agreement" which bears only his own signature and does not in any way name or mention the plaintiff. Indeed, the plaintiff testified that he never signed any such agreement with the defendant. Additionally, even if we were to find the agreement binding on the plaintiff, which we do not, we do not find that the language therein is sufficient to effectuate a legally binding assumption by the plaintiff of the lessor's duty to maintain the property in a safe and secure manner, free from unreasonable risks of harm. The document merely states that "you are responsible for your liability and personal insurance on your personal belongings" and "we expect you to maintain the property in a safe and secure manner." Nothing therein can be construed as shifting the lessor's legal responsibility pursuant to La. C.C. art. 2696. See Nelson v. Parkhurst, 304 So.2d 72, 73 (La.App. 1st Cir.1974), writ denied, 307 So.2d 631 (La.1975) (where this court found language contained in a lease contract that imposed on a lessee the obligation to "keep the premises in a reasonably good condition" was insufficient to constitute a waiver of the lessee's rights under the civil code to lease property free of vices and defects.)

QUANTUM
Defendant's last two assignments of error pertain to the amount of damages awarded.

General Damages
First, defendant argues that the trial court's general damage award is excessive because plaintiff did not seek medical care for his injuries for nearly one week, despite testifying to experiencing immediate excruciating pain, thereby failing to mitigate his damages. The trial court awarded plaintiff $30,000.00 in general damages. The evidence presented of plaintiff's pain and suffering from the injuries sustained in the fall on the steps consisted of the aforementioned testimony of the plaintiff and his wife regarding how Mr. McKnight's back and foot struck the concrete surrounding the portion of plywood that caved in when he stepped on it. Mr. McKnight testified that he felt immediate excruciating pain and Mrs. McKnight testified that he expressed such pain to her. Although Mr. McKnight did proceed with his plans to attend his aunt's funeral, he testified that he did so despite the pain. Although he was supposed to be a pallbearer at the funeral, he testified that the pain he was experiencing prevented him from doing anything more than place his hand, without any weight, on the handrail around the coffin, and that he let the other pallbearers know that he had been injured and was unable to help.
*50 The plaintiff and his wife testified that the pain in his back and leg persisted and worsened to the point of him experiencing "leg drop". Six days after the accident, on July 9, 1999, he sought medical treatment from his regular treating physician at Stanacola Medical Center, Dr. Daniel Wray, and subsequently from Drs. Acosta and Mitchell, to whom he was referred. Notwithstanding that he underwent x-rays, an MRI, physical therapy and acupuncture from July through October of 1999, when he was released from medical care, Mr. McKnight testified at the time of trial, in 2004, that the injury he suffered as a result of the fall on the steps in 1999 still causes him "nothing but pain . . . constant, year around." He testified that as of the date of trial, March 1, 2004, the pain from his injury restricted his daily activities, including simply getting out of bed in the mornings, strained his marital relationship, and prevented him from doing any kind of physical work. He testified that he returned to work at Home Depot when his doctor released him at the end of October, but that by December, the constant pain in his back and leg was so persistent that he could no longer work and was forced to quit. He testified at trial, that for a while, he held a sedentary job at Southern University, but that he had been laid off and was currently unemployed.
The record also contains Mr. McKnight's medical records. These reveal that he saw Dr. Wray as testified on July 9, 1999, complaining of low back pain and numbness and shooting pain down the left leg for approximately one week. Dr. Wray ordered X-rays of the lumbar spine, which revealed "a mild narrowing of the L5-S1 disk space." Dr. Wray prescribed pain medication and referred Mr. McKnight for a neurosurgical consultation with Dr. Acosta. Dr. Acosta saw Mr. McKnight on July 13, 1999, at which time he diagnosed him with "probable L4-L5 radiculopathy" and ordered an MRI and an EMG/nerve conduction study of the lumbosacral spine. Dr. Acosta also started the plaintiff on physical therapy and pain medications. The plaintiff also introduced the deposition testimony of Dr. Horace Mitchell, another neurosurgeon Mr. McKnight saw at Dr. Acosta's request at the NeuroMedical Center on August 25, 1999. Dr. Mitchell testified that the plaintiff's history revealed a slip and fall on some steps in July after which he had experienced immediate and persistent back and left leg pain. Dr. Mitchell testified that the MRI showed a "central disc protrusion at L5-S1 that was slightly eccentric to the left side" as well as nerve root impingement at L5-S1 on both sides, findings which would correlate with the problems and complaints the plaintiff was having. Dr. Mitchell also performed a physical examination of the plaintiff, which he testified also correlated with the symptoms of which the plaintiff complained. Dr. Mitchell gave Mr. McKnight a 10% anatomical disability rating, restricted his physical activities to no heavy lifting or repetitive twisting and prescribed lumbar traction. Dr. Mitchell testified that if the plaintiff continued to suffer from back pain after the recommended therapies, he would need future medical care that could range anywhere from more physical therapy to pain management to surgery for discectomy. However, Dr. Mitchell only saw plaintiff that one time; plaintiff's continued treatment through September and October was with Dr. Acosta. The last documented visit with Dr. Acosta was on October 11, 1999, at which time he noted that the plaintiff returned "post physical therapy and traction," that he was doing much better and his exam was totally normal. At that time, he released the plaintiff to return to work. Notwithstanding the plaintiff's testimony that persistent pain *51 caused him to quit work in December of 1999 and return to doctors for medical treatment, and that he was still in constant pain and unable to engage in any physical activity, the record contains no medical records beyond October 1999.
Against the backdrop of this evidence, we must evaluate defendant's claim that $30,000.00 awarded in general damages is excessive. First, there is no merit to the defendant's assertion that the award is excessive because plaintiff failed to mitigate his damages by enduring his pain and postponing medical treatment for approximately one week. First, this argument is unsupported by law. A plaintiff does not fail to mitigate his or her damages simply by delaying to seek medical help when the delay is not unreasonable and did not aggravate the injury. In Jackson v. Safeway Insurance Company of Louisiana, 2004-211 (La.App. 3rd Cir.6/30/04), 879 So.2d 364, 367-368, the court rejected defendant's similar argument where the plaintiff in that case waited ten months after an accident to seek medical attention upon finding the delay not unreasonable and the medical evidence failed to establish that his injuries were in any way worsened by the delay. In Dubroc v. Swain, XXXX-XXXX (La.App. 3rd Cir.12/11/02), 833 So.2d 538, 539-540, the same argument was rejected where the plaintiff waited three days to seek initial medical treatment and also had a fivemonth gap in treatment which she explained was due to financial concerns. In this case, there is no medical evidence that the plaintiff's injury or condition worsened in any way simply because he waited one week to seek medical treatment. The record, including the medical records and testimony, provides a reasonable factual basis for finding that Mr. McKnight injured his back and leg when he fell on the steps and that he suffered general pain and suffering as a result of that accident. According to the plaintiff, he has suffered constant pain and an inability to engage in physical activity from the date of the accident in July of 1999 through the date of the trial in March of 2004, approximately five years. While we agree with the defendant that the record fails to contain any evidence of medical treatment sought by the plaintiff beyond his release in October 1999 to corroborate his claim of pain and inability to function beyond this date, there is no evidence that that trial court failed to take this into consideration or that it otherwise abused its discretion in awarding $30,000.00 in general damage based on the evidence presented. Summarized, this includes at least three months of documented persistent and disabling back and leg pain, with correlated objective medical findings, months of acupuncture, physical therapy and pain medication resulting in an inability to engage in any physical activity, including difficulty in getting out of bed. The plaintiff also underwent an MRI, EMG and nerve conduction studies.
The discretion vested in the trier of fact is "vast" and the deference owed is so great that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.), cert. denied, 508 U.S. 910, 113 S.Ct. 2342, 124 L.Ed.2d 252 (1993). The reason for the vast discretion afforded the trier of fact is that reasonable persons frequently disagree about the measure of damages in a particular case. Id. The reason for the great deference is that the trial court, sitting as the trier of fact, is in the best position to observe and evaluate the witnesses' demeanor, including any outward manifestations of pain and/or restricted movement and is also in a superior position to assess the credibility of the witnesses than this court, which reviews the evidence from a "cold" record. *52 Given these guidelines and limitations, we simply do not find that the trial court's award of $30,000.00 in general damages to this plaintiff amounts to an abuse of discretion.

Lost Wages
The trial court also awarded the plaintiff past lost wages in the amount of $7,014.00. In his last assignment of error, the defendant claims the record supports no award for lost wages, since it contains only the plaintiff's testimony regarding his hourly rate of pay but no evidence of the number of hours worked or the amount of work missed as a result of his injuries.
Our review of the record however, reveals sufficient evidence to support an award for lost wages, but the amount awarded by the trial court exceeds the amount supported by the evidence and must be amended accordingly. The plaintiff testified that at the time of the accident he was employed as a sales associate for Home Depot, earning $8.35 per hour. He testified he had been employed with Home Depot for two to three years and prior to that, he had been a paramedic with the fire department for one to two years. The plaintiff also testified, and the medical records corroborate, that he missed work due to his injuries from the date of the accident, July 3, 1999, through October 11, 1999, when he was released to return. Thus, the record supports that the plaintiff missed fourteen weeks of work (lost wages) as a result of this accident. We also find no abuse of the trial court's discretion in deducing from the plaintiff's testimony that his employment with Home Depot was full time. Therefore, the record supports a lost wages award for fourteen weeks of work missed, at forty hours per week, at $8.35 per hour, which amount totals $4,676.00. The trial court's award of $7,014.00 is supported only by the plaintiff's calculation in a posttrial memorandum, which is neither evidence itself, nor is it supported by the evidence in the record. Therefore, the award for lost wages is amended to $4,676.00.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to reduce the damage award for lost wages from $7,014.00 to $4,676.00. In all other respects, the judgment is affirmed at appellant's cost.
AMENDED; AFFIRMED AS AMENDED.
MCCLENDON, J., concurs in part and dissents in part and assigns reasons.
McCLENDON, J., concurs in part, dissents in part.
I respectfully concur in the finding of liability and allocation of fault. Although I may have found the plaintiff more than twenty-five percent at fault, this court may not substitute its evaluations or inferences of fact for those of the factfinder, below absent manifest error. See Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
However, on the issue of the amount of general damages, I respectfully dissent. Under the particular facts of this case, with a plaintiff who received less than four months of active medical treatment and was released to return to work, I find that the award of $30,000.00 was an abuse of the trial court's discretion. See Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993).