THERIOT, J.
12This appeal is taken from a judgment entered by the Eighteenth Judicial District Court, granting the defendant-appellee’s motion for summary judgment' and dismissing the plaintiffs-appellants’ claims with prejudice. For the following reasons, we reverse and remand.
FACTS AND PROCEDURAL BACKGROUND
The plaintiffs-appellants, Blaine Mabile, Ryan Mabile, and Mabile’s Trucking, Inc. (collectively, “the Mabiles”), claim that the defendant-appellée, A Wilbert’s Sons, L.L.C. (“Wilbert’s”), violated its contractual obligations as lessor under the lessor’s warranty against vices or defects. The record reflects that, on March 21, 2005, Blaine and Ryan Mabile, as principals' of Mabile’s Trucking, Inc., entered into a lease agreement with Wilbert’s for the purpose of growing, harvesting, and marketing crawfish. The parties’ agreement was embodied in written form through a “Crawfish Lease,” wherein Wilbert’s agreed to lease to the Mabiles approximately 121 acres of land in West Baton Rouge Parish for the specific purpose of crawfish farming. The leased parcel of land was identified through attached aerial photographs.- The lease was granted to the Mabiles for an original term of four years and nine months, commencing on March 1, 2005 and terminating on December 31, 2009. Prior to the end of the original term of the lease, the parties agreed to an extension and modification of the lease, wherein Wilbert’s agreed to lease the same certain 121 acres of property to Blaine Mabile for the specific purpose ,of crawfish farming,[1]. and the Mabiles agreed to pay an increased annual rent to Wilbert’s for the lease. The ^extended and modified lease was granted for an additional one-year term, commencing on January 1, 2010 and terminating on December 31, 2010-
In accordance with-their rights as lessees, the Mabiles constructed crawfish ponds on the leased property and farmed ■crawfish thereupon during the 2005, 2006, 2007, 2008, 2009, and 2010 crawfish seasons. ■ It is undisputed that the crawfish farmed on the leased property during the 2005, 2006, 2007, and 2009 seasons were fit for commercial sale and consumption; indeed, the Mabiles admit these seasons were “without incident” and that profits were generated from the crawfishing activities on .the property .during these years. However, the Mabiles claim that the 2008 and 2010 crawfish seasons were “lost” and yielded them little or no profits because of hydrocarbon, contamination that rendered the crawfish unfit for sale or consumption.
. On March 4, 2011, the Mabiles filed suit against Wilbert’s and Stallion Oilfield Services, - Ltd. (“Stallion’’). ■ The Mabiles claimed Wilbert’s and Stallion were indebted unto them for losses and damages sustained as a result of the unsuccessful 2008 and 2010 crawfish- seasons and for a sum sufficient to demolish levees created by *100 them'-for commercial crawfish operations. In their original petition, the Mabiles asserted that Stallion operated an oil well on 'property adjacent to their lease, approximately onehalf mile from their commercial crawfish Operations. The'Mabiles claimed Stallion negligently allowed the leakage of certain substance's from its oil well that caused the hydrocarbon contamination of their crawfish ponds. ■ More specifically, they alleged that the casing or piping installed on Stallion’s oil well was cracked, broken, or otherwise leaking, which allowed pressurized hydrocarbons to migrate from the "well to a point where it escaped into the atmosphere through their crawfish ponds. The Mabiles' Ufurther alleged that Wilbert’s owned the land on which the Stallion oil well was located. The Mabiles claimed .that, as owners of adjoining property, Wilbert’s had the legal duty and obligation not to use or permit its property to be used in a manner causing injury to its neighbors.
Wilbert’s answered the Mabiles’ suit and filed a reconventional demand against the Mabiles for lost lease payments, lost rentals, and remediation damages. In relevant part, Wilbert’s alleged the Mabiles- permitted dumping of “oil-type compounds” into the ground that damaged the property and necessitated remediation. Additionally, Wilbert’s filed a third party demand against third-party defendants, TMR Exploration, Ihc. (“TMR”) and Park Exploration, Inc. (“Park”). Wilbert’s alleged.- it had entered into an.oil and gas lease with TMR, the rights .of which were subsequently transferred to Park, and .that TMR and Park were the'sole operators of the oil well alleged to have caused hydrocarbon contamination and had contractually agreed to indemnify Wilbert’s for the ■types of claims asserted by the Mabiles.
Through two amended petitions filed in this suit, the Mabiles dropped their claims .against Stallion and added TMR and the Mabiles’ own insurer, Shelter Insurance Companies (“Shelter”), as named defendants. Furthermore, the Mabiles amended their claims against Wilbert’s to specifically state a cause of action based upon alleged violations of Wilbert’s obligations as lessor of-the subject property. - In pertinent part, the Mabiles alleged that the lessor’s warranties described by the Louisiana Civil Code formed a part of their lease- agreement and that Wilbert’s had breached the lessor’s warranty against vices or defects in the leased property; that is, the Mabiles claimed Wilbert’s violated its obligation to warrant the leased | ^property be free of vices or defects preventing its use for the purposes for which it was leased.
Following extensive discovery and decision on various pre-trial motions that are not at issue on appeal, the Mabiles and Wilbert’s separately filed motions seeking the dismissal of all claims and third party demands respectively asserted by them against Park and TMR. In June of 2014, the trial court signed orders in accordance with the Mabiles’ and Wilbert’s motions, thereby dismissing Park and TMR from the suit.
Thereafter, Wilbert’s filed motions for partial summary judgment and summary judgment. First, Wilbert’s filed a motion for partial summary judgment, as to liability- only, on its reconventional demand against the Mabiles. In support' of its 'motion for partial éumrhary judgment, Wilbert’s asserted that the sole cause of the ■alleged contamination was'the fault and negligence of the Mabiles and that their fault and negligence caused damage and contamination of the leased property that required remediation. Additionally, Wilbert’s- filed a motion for summary judgment against the Mabiles, asserting' that it *101 was entitled to judgment as a matter;of law on the Mabiles’ principal demand.
In support of its motions for partial summary judgment and summary judgment, Wilbert’s detailed that the parties had completed extensive .discovery and submitted evidence from the parties’ proposed expert witnesses. Wilbert’s averred that the evidence indicated that the Ma-biles negligently spilled fuel and oil on the leased property, which likely caused the alleged contamination, and- argued that the Mabiles could not produce meaningful evidence with which to “rule out [the Ma-biles’] own poor housekeeping” as the cause of the alleged contamination. Wilbert’s asserted that the evidence submitted in support of their motion for summary | ¿judgment demonstrated that they were entitled to judgment as a matter of law, both as to the Mabiles’principal demand and on the issue of liability on its recon-ventional demand.
Following oral arguments on, inter alia, Wilbert’s motions for partial summary judgment and summary judgment, in open court, the trial court rendered judgment on said motions. The trial court ruled in favor of Wilbert’s on- its motion .for. summary judgment, dismissing the Mabiles’ suit with prejudice, reasoning the Mabiles had presented no evidence tending to establish that they could bear their burden of proving at trial' that Wilbert’s was “responsible for the contamination of the crawfish.” Furthermore, the trial court ruled against Wilbert’s on its motion for partial summary judgment, reasoning thé primary question involved in determining the merits of Wilbert’s reconventional demand was whether the Mabiles had breached their obligation under the terms of the lease to return the subject property to its original condition. The trial court explained that this particular question presented an issue of disputed fact-that, precluded granting partial summary judgment in favor of Wilbert’s.[2] On December 16, 2014, the trial court signed and rendered judgment accordingly. The Mabiles timely filed a motion for devolutive appeal from the trial court’s judgment on Wilbert’s motion for summary judgment.
ASSIGNMENTS OF ERROR
The Mabiles raise two assignments of error on appeal:
|71. The trial court erred in finding that an essential élement to the Mabiles’ claim for breach of warranty against vices and defects required proof that the defect complained of was caused by the lessor.
2. The trial court erred in granting Wilbert’s motion for summary judgment and in dismissing the Mabiles’ , claims against Wilbert’s.
STANDARD OF REVIEW
Summary judgment is subject to de novo review on appeal, using the same standards applicable to the trial court’s determination of the issues. The summary judgment' procedure is expressly favored in the law and is designed to secure the just,' speedy, and inexpensive determination of non-domestic, civil actions. La. C.C.P. art. 966(A)(2). Its purpose is to pierce the pleadings and to assess the *102 proof in order to see whether there is a genuine need for trial. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits in the record show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B)(2); Louisiana Hospital Ass’n v. State, 13-0579 (La.App. 1 Cir. 12/30/14), 168 So.3d 676, 684-85, writ denied, 15-0215 (La.5/1/15), 169 So.3d 372 (jurisprudential citations omitted).
DISCUSSION
For the purposes of summary judgment, a fact is material if it is essential to a cause of action under the applicable theory of recovery. Generally speaking, material facts are those that insure or preclude recovery, affect a litigant’s ultimate success, or determine the outcome of a legal dispute. See Pumphrey v. Harris, 12-0405 (La.App. 1 Cir. 11/2/12), 111 So.3d 86, 89. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be determined only in light of the substantive law applicable to that particular case. Id.
1 «Louisiana Civil Code arts. 2696-97 establish the generally applicable substantive legal principles concerning the lessor’s warranty against vices or defects in leased property. See Stuckey v. Riverstone Residential SC, LP, 08-1770 (La.App. 1 Cir. 8/5/09), 21 So.3d 970, 974, writ denied, 09-2328 (La.1/8/10), 24 So.3d 873. The relevant codal provisions'áre as follows:
The lessor warrants the lessee that the thing is suitable for the purpose for which it was leased and that it is free of vices or defects that prevent its use for that purpose.
This warranty also extends, to vices or defects that arise after the delivery of the thing and are not attributable to the fault of the lessee. ■ ■
La. C.C. art. 2696.
The warranty provided in [La. C.C. art. 2696] also encompasses vices or defects that are not known to the lessor.
However, if the lessee knows of such vices or defects and fails to notify the lessor, the lessee’s recovery for breach of warranty may be reduced accordingly.
La. C.C. art. 2697.
The warranty against vices or defects described by La. C.C. arts. 2696-97 can be waived as a condition to a lease, provided the waiver does not violate Louisiana public policy and is written in clear and unambiguous language that is brought to the attention of the lessee. La. C.C. art. 2699; see also, McKnight v. McCastle, 04-2437 (La.App. 1 Cir. 12/22/05), 928 So.2d 45, 49, writ denied, 06-0205 (La.4/24/06), 926 So.2d 548. In this case, the leases atissue did not include a waiver of the warranty against vices or defects. Therefore, the Mabiles were entitled .to the protections provided-to them, as lessees, under La. C.C. arts. 2696-97 throughout the duration of the leases in question.
laPreviously, this court has explained that a lessor is .“essentially strictly liable. for vices and defects that cause harm to his lessee.” Johnson v. Thomas, 13-0081 (La.App. 1 Cir. 12/27/13), 137 So,3d 632, 637. Although a lessor’s liability for damages caused by .vices or defects is not based on personal fault, see McGinty v. Pesson, 96-850 (La.App. 3 Cir. 12/11/96), 685 So.2d 541, 544, in order to establish a lessor’s liability under the warranty against vices or defects, a lessee. must prove, by a preponderance of the evidence, that there was a vice or defect in the leased, property and that the vice or defect caused the damage asserted. See Thompson v. BGK Equities, Inc., 04-2366 (La. *103 App. 1 Cir. 11/4/05), 927 So.2d 351, 354, writ denied, 05-2405 (La.3/17/06), 925 So.2d 550; see also, Cennett v. Arceneaux, 12-706 (La.App. 5 Cir. 5/23/13), 119 So.3d 670, 673. A “defect” in the context of the warranty against vices or defects has been defined by the jurisprudence as “a dangerous condition reasonably expected to cause injury to a prudent person using ordinary care under the circumstances.” Thompson, 927 So.2d at 354.
On appeal, the Mabiles first allege that Wilbert’s erroneously assumed it was also necessary for them to prove it was at fault for the contamination of the crawfish farmed on the leased property and that the trial court erred by adopting Wilbert’s misplaced reasoning. In pertinent part, the Mabiles direct this court to consider language from the trial court’s oral reasons for judgment, wherein the trial court stated: “[I]n this matter it’s essential that the plaintiff[s] prove by a preponderance of the evidence that Wilbert’s was, in fact, responsible for the contamination -of the crawfish.”
Whether or not the trial court mistakenly relied upon the improper burden of proof in its oral reasons for judgment, we would still need..to analyze the correctness of the trial court’s judgment based upon the law and | ^evidence. Appeal lies from the judgment itself, not the reasons for judgment. See Premier Games, Inc. v. State, Dept. of Public Safety & Corrections, Video Gaming Division, 99-0624 (La.App. 1 Cir. 5/12/00), 761 So.2d 707, 711, n. 4. Reasons for judgment set forth the basis for the trial court’s holding and are not binding. Id. Thus, the Ma-biles’ first, assignment of error does not merit relief. , ¡
Based upon..our de novo review of the record, however, we do find merit in the Mabiles’ second assignment of error. Wilbert’s, as movant on the motion for summary judgment, did not establish there were no genuine issues of material fact and that it was entitled to judgment as a matter of law, nor did it successfully point out the absence of .factual support for one or 'more essential elements to the Mabiles’ claims, as envisioned by La. C.C.P. art. 966(C)(2), which would have shifted the burden of proof on thp motion to the Ma-biles, to produce factual support sufficient .to establish that they would be able to satisfy their evidentiary burden of proof at trial.[3]
The uncontested evidence accepted on the motion for summary judgment establishes that at least some of the crawfish farmed on the leased property in 2008 and 2010 were contaminated by hydrocarbons and were therefore unfit for sale or consumption. Moreover, Wilbert’s was able to establish that the Mabiles maintained pumps, operated a tractor, and stored petrochemicals, including a 500 gallon diesel storage tank, upon the leased Inproperty. Additionally, the evidence tends to establish that the Mabiles spilled petrochemicals onto the ground from the area of the *104 leased property on which they maintained their crawfish farming equipment. However, there was conflicting evidence submitted on the motion for summary judgment regarding the connection" between the spillage of hydrocarbons, the contamination of the soil and water from the leased property, and the contamination of the crawfish farmed by the Mabiles on the leased land.
In support of its motion for summary judgment, Wilbert’s submitted evidence from several proposed experts on thé issue of its liability to the Mabiles, including Mr. George Cramer, II, P.G., Dr. Lánce Fonte-not, and Ms. Kimberly Gordon, P.E., P.G. Wilbert’s also presented evidence from the three liability experts named by the Ma-biles, Dr. John Finley,' Dr. James Bruya, and Mr. Richard Bray. Wilbert’s argued there were no genuine issues of material fact and it was entitled to judgment as a matter of law, reasoning its experts provided “consistent” and “specific” opinions, based upon scientific evidence and personal observation, that the Mabiles’ own actions on the leased property caused the contamination of their crawfish. Wilbert’s further averred that it was entitled to summary judgment because the Mabiles could not cite “meaningful opinions” from then proposed expert witnesses regarding “the probable source of the contamination of the plaintiffs’ crawfish”.
First,- Wilbert’s introduced evidence from Mr. Cramer, a professional hydro-geologist and expert in the fields of geology, hydrogeology, environmental regulations, remediation, and waste disposal. Mr. Cramer testified that he compiled multiple reports for. Wilbert’s concerning contamination in soil, sedimentary, and water samples taken from 'the leased property during site visits in, 2010 and 2013. Mr. Cramer testified that he | ^delivered and designated samples from the property for professional testing under protocols designed to measure hydrocarbon contamination, specifically focusing on hydrocarbons representative of refined oils rather than a broad variety of compounds. Mr. Cramer acknowledged that some of the soil and water samples taken from the property evidenced hydrocarbon contamination, but explained that the contaminated samples were primarily taken from that portion of the property on which the Mabiles operated pumps for their crawfish ponds. He therefore opined that the Mabiles’ own actions on the property were the most likely cause of the contamination of the crawfish, reasoning that the Mabiles’ “poor housekeeping at the pump sites” resulted in the spillage of heavy oils onto the ground, into the canal, and back into the crawfish ponds through the water intake system.
Next, Wilbert’s introduced evidence from Dr. Fontenot, a scientist in the fields of risk assessment and toxicology and an associate and partner of Mr. Cramer. Dr. Fontenot testified that he visited the leased property several times on behalf of Wilbert’s. Dr. Fontenot first visited the property in 2010, when the Mabiles were still actively farming crawfish thereupon, in order to investigate the cause of the alleged contamination of their crawfish. Dr. Fontenot stated that he personally observed that the water in the crawfish ponds was obviously contaminated, as evidenced by significant algae bloom. Dr. Fontenot testified that he witnessed a visible oil sheen on the water near the pumping site, and opined that the contamination was essentially defined by that area of the property on which the Mabiles’ maintained their tractor and diesel storage tanks. Dr. Fontenot opined that, based upon his personal investigation of the property and review of reports and documentation compiled by others, the contamination of the crawfish was most likely I ^caused by the *105 Mabiles’ own poor housekeeping with respect to petroleum products on the leased property.
Similarly, Wilbert’s presented evidence from Ms. Gordon, an expert in the fields of geosystem engineering and hydrogeology. Ms. Gordon testified that, based upon her reviéw of the evidence, the contamination of the soil on the leased property was “most probabl[y]” caused by the release of petrochemicals from fuel storage tanks on the area of the leased property on which the Mabiles operated their tractor and pumps. In an affidavit executed by Ms. Gordon and submitted on the motion for summary judgment, she further noted that soil contamination was found only in shallow soil boring samples and was primarily consistent in composition to diesel fuel.
The testimony of the Mabile’s experts was also introduced into evidence. First, Dr. Finley, a professor in the School of Nutrition and Food Science at Louisiana State University, testified that, in 2008, the Mabiles contacted him after customers began complaining of a “gasoline aroma” on some of the Mabiles’ crawfish. The Ma-biles brought crawfish and water samples taken from the property in 2008 to Dr. Finley for testing in accordance with EPA-approved procedures. In his deposition, Dr. Finley admitted that the specifies of some of the relevant tests had been lost prior to his testimony, but stated that, to the best of his recollection, some of the water samples were found to be contaminated by petroleum compounds and some of the crawfish were eventually found to be contaminated by complex hydrocarbons. The record reveals that. Dr. Finley had first suggested to the Mabiles that the contamination could be associated with a diesel oil spill. Nevertheless, Dr. Finley testified it was “unlikely” that the Mabiles had caused the contamination of their crawfish by spilling petrochemicals near lutheir crawfish ponds, reasoning he would expect the contaminated crawfish samples to be more broadly distributed in such instance. Dr. Finley therefore opined that the contamination of the Mabiles’ crawfish most likely arose fi’om hydrocarbon contamination in the aquifer underneath the leased property, which he theorized may have arisen due to an off-site spill of petrochemicals or the leakage of petrochemicals from an oil well underground.
Next, ' evidence from Dr, Bruya, a chemist specializing in explaining the significance of chemical testing and the characterization of petroleum products, was submitted, on the motion for, summary judgment. The Mabiles retained Dr. Bruya to review the lab tests performed by Wilbert’s experts on the soil and water samples taken from the leased property. Like Mr. Cramer, Dr. Bruya acknowledged that certain sedimentary and water samples. taken from the property showed evidence of contamination, but Dr. Bruya postulated that the contaminants could be either naturally-occurring elements or petroleum-based substances. ' Dr. Bruya stated that he could not rule out the possibility that the contaminated soil samples were caused by the spillage of petrochemicals on-site, but stated that he could rule out the possibility that the Mabiles had caused the water contamination by spilling diesel oil of other petrochemicals on the leased premises. He reasoned that the compounds uncovered by the testing of the water samples were physically insoluble and could not dissolve to the reported levels. Dr. Brüya therefore opined that the crawfish were most likely, contaminated by a substance-that-dissolved' in the water. He testified that the evidence indicated the potential existence of a localized subsurface plume of contaminants beneath the ground surface of the leased premises that may have caused the contamination of the crawfish.'
*106 | ^Finally, Wilbert’s introduced testimony from Mr. Richard Bray, the Mabiles proposed expert in the fields of geology, hydrogeology, site investigation, and soil and groundwater remediation. Mr. Bray testified that he visited and investigated the previously leased property in December of .2013, after .the property had been converted, from crawfish ponds to wetlands, mitigation banks, at which, time he collected soil samples for testing, Mr. Bray did not testify regarding the contamination of the crawfish themselves, but did testify regarding soil samples .taken from the property, which he stated evidenced quantifiable levels of diesel and oil contaminants and petroleum hydrocarbons. Mr. Bray acknowledged that these compounds were found in the vicinity of the “tractor site” and could not specifically determine the source of the identifiable compounds in the soil, but testified that there was a possibility that the soil contamination arose from gas migration below the leased premises.
In opposition to Wilbert’s motion for summary judgment, the Mabiles did not introduce any further • expert testimony,[4] but pointed , to portions of the experts’ testimony submitted by Wilbert’s that they claimed demonstrated a conflict in the evidence regarding whether they had caused the conditions that rendered their crawfish contaminated and unsuitable .for sale or consumption. The Mabiles argued there were genuine issues of material fact regarding whether the crawfish were contaminated as a result of.a.vice or defect existing in .the land itself. We agree.
As explained above, the Mabiles, as lessees, were required to prove, by a.preponderance of evidence, that there was a vice or defect in the leased Improperly and that the vice or defect caused the damage asserted. See Thompson, 927 So.2d at 354. The record reflects that there was conflicting evidence regarding the cause of a defective condition in the property itself that could be connected to the contamination of the crawfish farmed on the property. Resolution of conflicting expert testimony necessitates a credibility determination that the trial court is not, permitted to make when deciding whether to grant or deny a motion for summary judgment. See Pumphrey, 111 So.3d at 91. Consequently, the trial court erred by granting summary judgment in favor of Wilbert’s. The Mabiles’ second assignment of error merits relief.
DECREE
For the reasons expressed above, the trial court’s December 16,. 2014 judgment, granting Wilbert’s motion for summary judgment and dismissing the Mabiles’ claims with prejudice, is reversed. This matter is remanded to the trial court for further proceedings in accordance with this opinion. All costs of this appeal are assessed against the defendant-appellee, A. Wilbert’s Sons, L.L.C..
REVERSED AND REMANDED.
McCLENDON, J., concurs and assigns reasons.
McDONALD, J., concurs.

. Although the second lease was styled and executed as a new lease between Wilbert’s and Blaine Mabile, the Mabiles represented in suit that the second lease was intended as a “continuation of the preceding lease” for and on behalf of Blaine Mabile, Ryan Mabile, and Mabile’s Trucking, Inc.

. We note that the trial court’s ruling granting summary judgment in favor of Wilbert’s and dismissing the Mabiles’ suit with prejudice is the sole matter at issue on appeal. The trial court’s ruling on the motion for summary judgment constitutes an immediately appealable partial final judgment pursuant to La. C.C.P. art. 1915(A). The trial court’s judgment denying Wilbert’s motion for partial summary judgment is not a final appealable judgment and is not before us on appeal. Wilbert’s reconventional demand remains pending before the trial court.

. Louisiana Code of Civil Procedure art. 966(C)(2) provides:
The burden of proof remains with the mov-ant. However, if -the movant .will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an ábsence of factual support for one or more elements essential to the adverse party's ■claim, action, or defense. Thereafter, if.the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is 'no genuine issue of material fact.

. While the Mabiles did not introduce further expert testimony regarding the source of the contamination in opposition to Wilbert's motion for summary judgment, they did introduce evidence from members of the Mabile family, including Blaine Mabile, Ryan Mabile, and Russ Mabile; from Mr.. Edward Simmons, CPA, an expert in the fields of accounting and economic damages; and from Mr. Curtis Carbo, a fellow crawfish farmer who leased property adjacent to the Mabiles.